## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **DEBRA MCVICKER,** on behalf of herself and all others similarly situated, | Case No. |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| **VALLEY VETERINARY CLINIC, LLC, d/b/a VALLEY VET SUPPLY** | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff Debra McVicker ("Plaintiff"), individually and on behalf of all similarly situated persons, alleges the following against Valley Veterinary Clinic, LLC, d/b/a Valley Vet Supply ("Valley Vet" or "Defendant") based upon personal knowledge with respect to herself and on information and belief derived from, among other things, investigation by her counsel and review of public documents as to all other matters:

### I.    INTRODUCTION

1.    Plaintiff brings this class action against Valley Vet for its failure to properly secure and safeguard Plaintiff's and other similarly situated Valley Vet customers' and website users' first and last names and payment card information (the "Private Information") from hackers.

2.    Valley Vet, based in Marysville, Kansas, is a horse and livestock supply company that serves thousands of customers nationwide.

3.      On or about April 23, 2024, Valley Vet filed official notice of a hacking incident with the Office of the Maine Attorney General.[1]

4.      On or about April 23, 2024, Valley Vet also sent out data breach letters to individuals whose information was compromised as a result of the hacking incident.

5.      Based on the Notice filed by the company, on March 28, 2024, Valley Vet detected unusual activity on some of its computer systems. In response, the company launched an investigation. The Valley Vet investigation revealed that an unauthorized party had access to certain company files between February 4, 2024, and March 4, 2024 (the "Data Breach").

6.      Plaintiff and "Class Members" (defined below) were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm. The risk will remain for their respective lifetimes.

7.      The Private Information compromised in the Data Breach included highly sensitive data that represents a gold mine for data thieves, including but not limited to, payment card information that Valley Vet collected and maintained.

8.      Armed with the Private Information accessed in the Data Breach, data thieves can commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names and taking out loans in Class Members' names.

9.      There has been no assurance offered by Valley Vet that all personal data or copies of data have been recovered or destroyed, or that Defendant has adequately enhanced its data security practices sufficient to avoid a similar breach of its network in the future.

10.     Therefore, Plaintiff and Class Members have suffered and are at an imminent, immediate, and continuing increased risk of suffering ascertainable losses in the form of harm

---

[1] *See* https://apps.web.maine.gov/online/aeviewer/ME/40/096d14e1-70c0-48b2-ad33-bb0315d4a47d.shtml (last visited Apr. 30, 2024).

from identity theft and other fraudulent misuse of their Private Information, the loss of the benefit of their bargain, out-of-pocket expenses incurred to remedy or mitigate the effects of the Data Breach, and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

11.    Plaintiff brings this class action lawsuit to address Valley Vet's inadequate safeguarding of Class Members' Private Information that it collected and maintained.

12.    The potential for improper disclosure and theft of Plaintiff's and Class Members' Private Information was a known risk to Valley Vet, and thus Valley Vet was on notice that failing to take necessary steps to secure the Private Information left it vulnerable to an attack.

13.    Upon information and belief, Valley Vet and its employees failed to properly monitor and implement security practices with regard to the computer network and systems that housed the Private Information. Had Valley Vet properly monitored its networks, it would have discovered the Breach sooner.

14.    Plaintiff's and Class Members' identities are now at risk because of Valley Vet's negligent conduct as the Private Information that Valley Vet collected and maintained is now in the hands of data thieves and other unauthorized third parties.

15.    Plaintiff seeks to remedy these harms on behalf of herself and all similarly situated individuals whose Private Information was accessed and/or compromised during the Data Breach.

16.    Accordingly, Plaintiff, on behalf of herself and the Class, asserts claims for negligence, negligence *per se*, breach of implied contract, unjust enrichment, and declaratory judgment.

## II.     PARTIES

17.    Plaintiff Debra McVicker is and at all times mentioned herein was, an individual citizen of the State of Kentucky.

18.    Defendant Valley Vet is a horse and livestock supply company incorporated in Delaware with its principal place of business at 1118 Pony Express Highway, Marysville, Kansas, 66508.

## III.     JURISDICTION AND VENUE

19.    The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of class members is over 100, many of whom have different citizenship from Valley Vet. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

20.    This Court has jurisdiction over Valley Vet because Valley Vet operates in and/or is incorporated in this District.

21.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District and Valley Vet has harmed Class Members residing in this District.

## IV.     FACTUAL ALLEGATIONS

### A. Valley Vet's Business and Collection of Plaintiff's and Class Members' Private Information

22.    Valley Vet is a livestock and horse supply company. Founded in 1985, Valley Vet began as a veterinary clinic and expanded to a local supply store in 1994. Valley Vet offers 23,000 products serving thousands of customers nationwide. Valley Vet employs more than 150 people and generates approximately $20.9 million in annual revenue.

23.     As a condition of receiving products, Valley Vet requires that its customers entrust it with highly sensitive personal information. In the ordinary course of receiving service from Valley Vet, Plaintiff and Class Members were required to provide their Private Information to Defendant.

24.     Valley Vet uses this information, *inter alia*, for marketing, advertising, and promotional purposes.

25.     In its notice letter, Valley Vet states "[w]e take the privacy of information in our care seriously[.]" In its Privacy Policy, Valley Vet promises its customers that it will "take commercially reasonable steps intended to protect such data against unauthorized access"[2]  and Valley Vet also informs its customers that "we employ security measures that are intended to be consistent with industry best practices."[3]

26.     Valley Vets' Security website states:

> Valley Vet Supply understands your concerns over internet security. Because we share your concerns, we've worked hard to develop the best secure online ordering process we can provide - one that lets you shop and order with confidence. Our website uses security measures, including encryption and industry-standard website security monitoring, to protect your information. This gives us a high level of confidence in the security of our website.[4]

27.     Clearly, Defendant failed to implement the security features it promises its customers and e-Payment platform users that it will implement.

28.     The PCI DSS (Payment Card Industry Data Security Standard) compliance sets forth numerous requirements for businesses that store, process, or transmit payment card data to observe. The PCI DSS defines measures for ensuring data protection and consistent security

---

[2] *See* https://www.valleyvet.com/si_privacy.html (last visited Apr. 30, 2024).
[3] *Id.*
[4] See https://www.valleyvet.com/si_security.html (last visited Apr. 30, 2024).

processes and procedures around online financial transactions. Businesses that fail to maintain PCI DSS compliance are subject to steep fines and penalties.

29.     As formulated by the PCI Security Standards Council, the mandates of PCI DSS compliance include, in part: developing and maintaining a security policy that covers all aspects of the business, installing firewalls to protect data, and encrypting cardholder data that is transmitted over public networks, and using anti-virus software and updating it regularly.[5]

30.     To make payments using Defendant's "Xpress-Pay" software/website, customers and users can either create an account or check out as a guest. Either choice requires, at a minimum, that the customer enter the following PII onto the website:

- First and Last Name;

- Payee's Full Billing Address;

- Phone Number;

- Email;

- Credit/Debit Card Type;

- Full Credit/Debit Card Number;

- Credit/Debit Card Security Code or CSV Number; and

- Credit/Debit Card Expiration Date

31.     Indeed, this sensitive PII and payment information is all that hackers would need to commit fraudulent and criminal acts against the individuals affected by the Data Breach.

32.     Because of the highly sensitive and personal nature of the information Valley Vet acquires and stores with respect to its customers, Valley Vet, upon information and belief,

---

[5]  *See* PCI Security Standards Council, *available at*: https://www.pcisecuritystandards.org/  (last visited Apr. 30, 2024).

promises to, among other things: keep customers' Private Information private; comply with industry standards related to data security and the maintenance of its customers' Private Information; inform its customers of its legal duties relating to data security and comply with all federal and state laws protecting customers' Private Information; only use and release customers' Private Information for reasons that relate to the services it provides; and provide adequate notice to customers if their Private Information is disclosed without authorization.

33.    By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Valley Vet assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure and exfiltration.

34.    Plaintiff and Class Members relied on Valley Vet to keep their Private Information confidential and securely maintained and to only make authorized disclosures of this information, which Defendant ultimately failed to do.

**B.**  **The Data Breach and Valley Vet's Inadequate Notice to Plaintiff and Class Members**

35.    According to Defendant's Notice, it learned of unauthorized access to its computer systems on March 28, 2024, with such unauthorized access having taken place between February 4, 2024, and March 4, 2024.

36.    Through the Data Breach, the unauthorized cybercriminal(s) accessed a cache of highly sensitive Private Information, including names and payment card information.

37.    On or about April 23, 2024, Valley Vet learned that the Class' Private Information was first accessed by cybercriminals, Valley Vet finally began to notify customers that its investigation determined that their Private Information was impacted.

38.     Valley Vet delivered Data Breach Notification Letters to Plaintiff and Class Members, alerting them that their highly sensitive Private Information had been exposed in an "incident."

39.     The notice letter then attached some pages entitled "Steps You Can Take To Help Protect Your Information," which listed generic steps that victims of data security incidents can take, such as getting a copy of a credit report or notifying law enforcement about suspicious financial account activity. Other than providing one year of crediting monitoring that Plaintiff and Class Members would have to affirmatively sign up for and a call center number that victims could contact "with any questions," Valley Vet offered no other substantive steps to help victims like Plaintiff and Class Members to protect themselves. On information and belief, Valley Vet sent a similar generic letter to all individuals affected by the Data Breach.

40.     Valley Vet had obligations created by contract, industry standards, common law, and representations made to Plaintiff and Class Members to keep Plaintiff's and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

41.     Plaintiff and Class Members provided their Private Information to Valley Vet with the reasonable expectation and mutual understanding that Valley Vet would comply with its obligations to keep such information confidential and secure from unauthorized access and to provide timely notice of any security breaches.

42.     Valley Vet's data security obligations were particularly important given the substantial increase in cyberattacks in recent years.

43.     Valley Vet knew or should have known that its electronic records would be targeted by cybercriminals.

C. **Valley Vet Failed to Comply with FTC Guidelines**

44.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

45.    In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

46.    The FTC further recommends that companies not maintain personally identifiable information ("PII") longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

47.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and

appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

48.     As evidenced by the Data Breach, Valley Vet failed to properly implement basic data security practices. Valley Vet's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

49.     Valley Vet was at all times fully aware of its obligation to protect the Private Information of its customers yet failed to comply with such obligations. Defendant was also aware of the significant repercussions that would result from its failure to do so.

**D.  Securing PII and Preventing Breaches**

50.     In a debit or credit card purchase transaction on an e-Payment platform, card data must flow through multiple systems and parties to be processed. Specifically:

> "When you use your credit card to order the book on the vendor's web site, you'll be asked to enter your credit card information, including the expiration date, three-digital card verification value code and address.
>
> Once you hit the submit button, a payment gateway comes into play. Its main job is to approve or deny payment requests.
>
> The gateway transfers information between a website or smartphone and your credit card bank account.
>
> It validates the accuracy of the payment information and uses security protocols and encryptions to make sure the transactions remain safe.
>
> The payment gateway forwards your purchase request to your company's credit card company. This company, in turn, verifies whether there's enough money in your credit card account to pay for the book.

If so, the gateway sends the payment to the vendor."[6]

51.     There are two points in the payment process where sensitive cardholder data is at risk of being exposed or stolen: when the consumer submits their personal information and payment card information to the e-Payment platform, and when the e-Payment platform forwards this information to the vendor. This risk is greatly increased when the e-Payment platform, like Defendant's, stores consumer's personal information and payment information on its computer systems.

52.     Encryption mitigates security weaknesses that exist when consumer data has been stored by using algorithmic schemes to transform plain text information into a non-readable format called "ciphertext." By scrambling the Private Information and payment card data the moment it is submitted, hackers who steal the data are left with useless, unreadable text in the place of payment card numbers accompanying the cardholder's personal and payment information stored in the e-Payment platform's computers. Defendant failed to implement such a simple solution, which would have protected its customers' Private Information. Additionally, to make matters worse, Defendant stored the Private Information, including payment information, on its computer network further exposing its website users' PII and payment card information to the risk of being stolen.

53.     The financial fraud and other injuries outlined herein suffered by Plaintiff and other customers demonstrates that Defendant (a) chose not to invest in the technology to encrypt payment card data ("PCD") at point-of-sale and in storage on its computer systems to make its customers' data more secure; (b) failed to install updates, patches, and malware protection or to

---

[6] *See* "*Electronic Payment Systems: Everything You Need to Know*" (July 26, 2022) *available at* https://www.avidxchange.com/blog/electronic-payment-systems-faqs-everything-you-need-to-know/ (last visited Apr. 30, 2024).

install them in a timely manner to protect against a data security breach; and/or (c) failed to provide sufficient control of employee credentials and access to computer systems to prevent a security breach and/or theft of PCD.

54.     These failures demonstrate a clear breach of the Payment Card Industry Data Security Standards (PCI DSS), which are industry-wide standards for any organization that handles PCD.

### E.   Valley Vet Failed to Comply with Industry Standards

55.     As noted above, experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

56.     Some industry best practices that should be implemented by businesses like Valley Vet include but are not limited to educating all employees, strong password requirements, multilayer security including firewalls, anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data, and limiting which employees can access sensitive data. As evidenced by the Data Breach, Defendant failed to follow some or all of these industry best practices.

57.     Other best cybersecurity practices that are standard in the industry include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points. As evidenced by the Data Breach, Defendant failed to follow these cybersecurity best practices.

58.     Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation

PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

59.     Defendant failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

**F.  Valley Vet Breached its Duty to Safeguard Plaintiff's and Class Members' Private Information**

60.     In addition to its obligations under federal and state laws, Valley Vet owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Valley Vet owed a duty to Plaintiff and Class Members to provide reasonable security, including complying with industry standards and requirements, training for its staff, and ensuring that its computer systems, networks, and protocols adequately protected the Private Information of Class Members

61.     Valley Vet breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data. Valley Vet's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

    a.  Failing to maintain an adequate, PCI DSS-compliant data security system that would reduce the risk of data breaches and cyberattacks;

    b.  Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

    c.  Failing to adequately protect customers' Private Information;

d.   Failing to properly monitor its own data security systems for existing intrusions;

e.   Failing to sufficiently train its employees regarding the proper handling of its customers Private Information;

f.   Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTCA;

g.   Failing to adhere to industry standards for cybersecurity as discussed above; and

h.   Otherwise breaching its duties and obligations to protect Plaintiff's and Class Members' Private Information.

62.     Valley Vet negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information by allowing cyberthieves to access its computer network and systems which contained unsecured and unencrypted Private Information.

63.     Had Valley Vet remedied the deficiencies in its information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, it could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiff's and Class Members' confidential Private Information.

64.     Accordingly, Plaintiff's and Class Members' lives were severely disrupted. What's more, they have been harmed as a result of the Data Breach and now face an increased risk of future harm that includes, but is not limited to, fraud and identity theft. Plaintiff and Class Members also lost the benefit of the bargain they made with Valley Vet.

**G.   <u>Valley Vet Should Have Known that Cybercriminals Target Private Information to Carry Out Fraud and Identity Theft</u>**

65.     The FTC hosted a workshop to discuss "informational injuries," which are injuries that consumers like Plaintiff and Class Members suffer from privacy and security incidents such

14

as data breaches or unauthorized disclosure of data.[7] Exposure of highly sensitive personal information that a consumer wishes to keep private may cause harm to the consumer, such as the ability to obtain or keep employment. Consumers' loss of trust in e-commerce also deprives them of the benefits provided by the full range of goods and services available which can have negative impacts on daily life.

66.     Any victim of a data breach is exposed to serious ramifications regardless of the nature of the data that was breached. Indeed, the reason why criminals steal information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims or to take over victims' identities in order to engage in illegal financial transactions under the victims' names.

67.     Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity or to otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

68.     In fact, as technology advances, computer programs may scan the Internet with a wider scope to create a mosaic of information that may be used to link compromised information to an individual in ways that were not previously possible. This is known as the "mosaic effect."

---

[7] *FTC Information Injury Workshop, BE and BCP Staff Perspective,* Federal Trade Commission, (October 2018), *available at* https://www.ftc.gov/system/files/documents/reports/ftc-informational-injury-workshop-be-bcp-staff-perspective/informational_injury_workshop_staff_report_-_oct_2018_0.pdf (last visited on Apr. 30, 2024).

Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts.

69.     Thus, even if certain information was not purportedly involved in the Data Breach, the unauthorized parties could use Plaintiff's and Class Members' Private Information to access accounts, including, but not limited to, email accounts and financial accounts, to engage in a wide variety of fraudulent activity against Plaintiff and Class Members.

70.     One such example of this is the development of "Fullz" packages.

71.     Cybercriminals can cross-reference two sources of the Private Information compromised in the Data Breach to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

72.     The development of "Fullz" packages means that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and the proposed Class's phone numbers, email addresses, and other sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card or financial account numbers may not be included in the Private Information stolen in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff and other Class Members' stolen Private Information are being misused, and that such misuse is fairly traceable to the Data Breach.

73.     For these reasons, the FTC recommends that identity theft victims take several time-consuming steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert on their account (and an extended fraud alert that lasts for 7 years if someone steals the victim's identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a freeze on their credit, and correcting their credit reports.[8] However, these steps do not guarantee protection from identity theft but can only mitigate identity theft's long-lasting negative impacts.

74.     PII is data that can be used to detect a specific individual. PII is a valuable property right. Its value is axiomatic, considering the value of big data in corporate America and the consequences of cyber thefts (which include heavy prison sentences). Even this obvious risk-to-reward analysis illustrates beyond doubt that PII has considerable market value.

75.     The U.S. Attorney General stated in 2020 that consumers' sensitive personal information commonly stolen in data breaches "has economic value."[9] The increase in cyberattacks, and attendant risk of future attacks, was widely known and completely foreseeable to the public and to anyone in Defendant's industry.

76.     The PII of consumers remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, PII can be sold at a price ranging from $40 to $200, and bank details

---

[8] *See IdentityTheft.gov,* Federal Trade Commission, *available at* https://www.identitytheft.gov/Steps (last visited Apr. 30, 2024).
[9] *See Attorney General William P. Barr Announces Indictment of Four Members of China's Military for Hacking into Equifax*, U.S. Dep't of Justice, Feb. 10, 2020, available at https://www.justice.gov/opa/speech/attorney-general-william-p-barr-announces-indictment-fourmembers-china-s-military (last visited on Apr. 30, 2024).

have a price range of \$50 to \$200.[10] Experian reports that a stolen credit or debit card number can sell for \$5 to \$110 on the dark web and that the "*fullz*" (a term criminals who steal credit card information use to refer to a complete set of information on a fraud victim) sold for \$30 in 2017.[11]

77.     Furthermore, even information such as names, email addresses and phone numbers, can have value to a hacker.  Beyond things like spamming customers, or launching phishing attacks using their names and emails, hackers, *inter alia*, can combine this information with other hacked data to build a more complete picture of an individual.  It is often this type of piecing together of a puzzle that allows hackers to successfully carry out phishing attacks or social engineering attacks. This is reflected in recent reports, which warn that "[e]mail addresses are extremely valuable to threat actors who use them as part of their threat campaigns to compromise accounts and send phishing emails."[12]

78.     The Dark Web Price Index of 2022, published by PrivacyAffairs[13] shows how valuable just email addresses alone can be, even when not associated with a financial account:

| Email Database Dumps | Avg. Price USD (2022) |
| --- | --- |
| 10,000,000 USA email addresses | \$120 |
| 600,000 New Zealand email addresses | \$110 |
| 2,400,000 million Canada email addresses | \$100 |

---

[10] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited on Apr. 30, 2024).

[11] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited on Apr. 30, 2024).
[12] *See* https://www.magicspam.com/blog/dark-web-price-index-the-cost-of-email-data/ (last visited on Apr. 30, 2024).

[13] *See* https://www.privacyaffairs.com/dark-web-price-index-2022/ (last visited on Apr. 30, 2024).

79.     Beyond using email addresses for hacking, the sale of a batch of illegally obtained email addresses can lead to increased spam emails.  If an email address is swamped with spam, that address may become cumbersome or impossible to use, making it less valuable to its owner.

80.     Likewise, the value of PII is increasingly evident in our digital economy.  Many companies including Valley Vet collect PII for purposes of data analytics and marketing. These companies, collect it to better target customers, and shares it with third parties for similar purposes.[14]

81.     One author has noted: "Due, in part, to the use of PII in marketing decisions, commentators are conceptualizing PII as a commodity. Individual data points have concrete value, which can be traded on what is becoming a burgeoning market for PII."[15]

82.     Consumers also recognize the value of their personal information and offer it in exchange for goods and services. The value of PII can be derived not only by a price at which consumers or hackers actually seek to sell it, but rather by the economic benefit consumers derive from being able to use it and control the use of it.

83.     A consumer's ability to use their PII is encumbered when their identity or credit profile is infected by misuse or fraud. For example, a consumer with false or conflicting information on their credit report may be denied credit. Also, a consumer may be unable to open an electronic account where their email address is already associated with another user.  In this sense, among others, the theft of PII in the Data Breach led to a diminution in value of the PII.

---

[14] *See* https://robinhood.com/us/en/support/articles/privacy-policy/ (last visited on Apr. 30, 2024).

[15] *See* John T. Soma, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ('PII') Equals the "Value" of Financial Assets,* 15 Rich. J. L. & Tech. 11, 14 (2009).

84.     Data breaches, like that at issue here, damage consumers by interfering with their fiscal autonomy. Any past and potential future misuse of Plaintiff's PII impairs their ability to participate in the economic marketplace.

85.     A study by the Identity Theft Resource Center[16] shows the multitude of harms caused by fraudulent use of PII:



86.     It must also be noted that there may be a substantial time lag between when harm occurs and when it is discovered, and also between when PII and/or personal financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:[17]

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on

---

[16] Steele, Jason, *Credit Card and ID Theft Statistics*, CreditCards.com (October 23, 2017), *available at* https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276/ (last visited Apr. 30, 2024).

[17] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO (June 2007), *available at* https://www.gao.gov/assets/270/262904.html (last visited Apr. 30, 2024).

the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

87.     PII is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black market" for years.

88.     As a result, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiff and Class Members have no choice but to vigilantly monitor their accounts for many years to come.

**H.  Plaintiff's and Class Members' Damages**

*Plaintiff Debra McVicker's Experience*

89.     When Plaintiff McVicker first became a customer, Defendant required Plaintiff McVicker provide it with substantial amounts of her PII, including her payment information.

90.     On or about April 23, 2024, Plaintiff McVicker received a letter which told her that her Private Information had been impacted  during the Data Breach. The notice letter informed her that the Private Information compromised included her "first and last name in combination with payment card information."

91.     The notice letter offered Plaintiff McVicker only one year of credit monitoring services. One year of credit monitoring is not sufficient given that Plaintiff McVicker will now experience a lifetime of increased risk of identity theft and other forms of targeted fraudulent misuse of her Private Information.

92.     Plaintiff McVicker suffered actual injury in the form of time spent dealing with the Data Breach and the increased risk of fraud resulting from the Data Breach and/or monitoring her accounts for fraud.

93.     Plaintiff McVicker would not have provided her Private Information to Defendant had Defendant timely disclosed that its systems lacked adequate computer and data security practices to safeguard its customers' personal information from theft, and that those systems were subject to a data breach.

94.     Plaintiff McVicker suffered actual injury in the form of having her Private Information compromised and/or stolen as a result of the Data Breach.

95.     Plaintiff McVicker suffered actual injury in the form of damages to and diminution in the value of her personal and financial information – a form of intangible property that Plaintiff McVicker entrusted to Defendant for the purpose of receiving commercial services from Defendant and which was compromised in, and as a result of, the Data Breach.

96.     Plaintiff McVicker suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by her Private Information being placed in the hands of criminals.

97.     Plaintiff McVicker has a continuing interest in ensuring that her Private Information, which remains in the possession of Defendant, is protected and safeguarded from future breaches.

98.     As a result of the Data Breach, Plaintiff McVicker made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing financial accounts for any indications of actual or attempted identity theft or fraud, and researching the credit monitoring offered by Defendant, as well as long-term credit monitoring options she will now need to use. Plaintiff McVicker has spent several hours dealing with the Data Breach, valuable time she otherwise would have spent on other activities.

99.     As a result of the Data Breach, Plaintiff McVicker has suffered anxiety as a result of the release of her Private Information to cybercriminals, which Private Information she believed would be protected from unauthorized access and disclosure. These feelings include anxiety about unauthorized parties viewing, selling, and/or using her Private Information for purposes of committing cyber and other crimes against her. Plaintiff McVicker is very concerned about this increased, substantial, and continuing risk, as well as the consequences that identity theft and fraud resulting from the Data Breach will have on her life.

100.     Plaintiff McVicker also suffered actual injury as a result of the Data Breach in the form of (a) damage to and diminution in the value of her Private Information, a form of property that Defendant obtained from Plaintiff McVicker; (b) violation of her privacy rights; and (c) present, imminent, and impending injury arising from the increased risk of identity theft, and fraud she now faces.

101.     As a result of the Data Breach, Plaintiff McVicker anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the many harms caused by the Data Breach.

102.     In sum, Plaintiff and Class Members have been damaged by the compromise of their Private Information in the Data Breach.

103.     Plaintiff and Class Members entrusted their Private Information to Defendant in order to receive Defendant's services.

104.     Plaintiff's Private Information was subsequently compromised as a direct and proximate result of the Data Breach, which Data Breach resulted from Defendant's inadequate data security practices.

105.    As a direct and proximate result of Valley Vet's actions and omissions, Plaintiff and Class Members have been harmed and are at an imminent, immediate, and continuing increased risk of harm, including but not limited to, having credit card accounts opened in their names, and other forms of identity theft.

106.    Further, as a direct and proximate result of Valley Vet's conduct, Plaintiff and Class Members have been forced to spend time dealing with the effects of the Data Breach.

107.    Plaintiff and Class Members also face a substantial risk of being targeted in future phishing, data intrusion, and other illegal schemes through the misuse of their Private Information, since potential fraudsters will likely use such Private Information to carry out such targeted schemes against Plaintiff and Class Members.

108.    The Private Information maintained by and stolen from Defendant's systems, combined with publicly available information, allows nefarious actors to assemble a detailed mosaic of Plaintiff and Class Members, which can also be used to carry out targeted fraudulent schemes against Plaintiff and Class Members.

109.    Plaintiff and Class Members also lost the benefit of the bargain they made with Valley Vet. Plaintiff and Class Members overpaid for services that were intended to be accompanied by adequate data security but were not. Indeed, part of the price Plaintiff and Class Members paid to Valley Vet was intended to be used by Valley Vet to fund adequate security of Valley Vet's system and protect Plaintiff's and Class Members' Private Information. Thus, Plaintiff and the Class did not receive what they paid for.

110.    Additionally, as a direct and proximate result of Valley Vet's conduct, Plaintiff and Class Members have also been forced to take the time and effort to mitigate the actual and potential impact of the data breach on their everyday lives, including placing "freezes" and "alerts" with

credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

111.    Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

112.    Additionally, Plaintiff and Class Members also suffered a loss of value of their PII and PHI when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases. An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[18] In fact, consumers who agree to provide their web browsing history to the Nielsen Corporation can in turn receive up to $50 a year.[19]

113.    As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and illegal markets, has been harmed and diminished due to its acquisition by cybercriminals. This transfer of valuable information happened with no consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is apparently readily available to others, and the rarity of the Private Information has been destroyed because it is no longer only held by Plaintiff and the Class Members, and because that data no longer necessarily correlates only with activities undertaken by Plaintiff and the Class Members, thereby causing additional loss of value.

---

[18] *See* https://thequantumrecord.com/blog/data-brokers-profit-from-our-data/#:~:text=The%20business%20of%20data%20brokering,annual%20revenue%20of%20%24200%20billion. (last visited on Apr. 30, 2024).

[19] *Frequently Asked Questions,* Nielsen Computer & Mobile Panel, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited Apr. 30, 2024).

114.     Plaintiff and Class Members were also damaged via benefit-of-the-bargain damages. The contractual bargain entered into between Plaintiff and Heartland included Defendant's contractual obligation to provide adequate data security, which Defendant failed to provide. Thus, Plaintiff and Class Members did not get what they bargained for.

115.     Finally, Plaintiff and Class Members have suffered or will suffer actual injury as a direct and proximate result of the Data Breach in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach. These losses include, but are not limited to, the following:

    a.   Monitoring for and discovering fraudulent charges;

    b.   Canceling and reissuing credit and debit cards;

    c.   Addressing their inability to withdraw funds linked to compromised accounts;

    d.   Taking trips to banks and waiting in line to obtain funds held in limited accounts;

    e.   Spending time on the phone with or at a financial institution to dispute fraudulent charges;

    f.   Contacting financial institutions and closing or modifying financial accounts;

    g.   Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

    h.   Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled; and

i. Closely reviewing and monitoring bank accounts and credit reports for additional unauthorized activity for years to come.

116. Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which is believed to still be in the possession of Valley Vet, is protected from future additional breaches by the implementation of more adequate data security measures and safeguards, including but not limited to, ensuring that the storage of data or documents containing personal and financial information is not accessible online, that access to such data is password-protected, and that such data is properly encrypted.

117. As a direct and proximate result of Valley Vet's actions and inactions, Plaintiff and Class Members have suffered a loss of privacy and have suffered cognizable harm, including an imminent and substantial future risk of harm, in the forms set forth above.

## V.    CLASS ACTION ALLEGATIONS

118. Plaintiff brings this action individually and on behalf of all other persons similarly situated, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

119. Specifically, Plaintiff proposes the following Nationwide Class definition (referred to herein as the "Class"), subject to amendment as appropriate:

**Nationwide Class**

All individuals in the United States who had Private Information accessed and/or acquired as a result of the Data Breach, including all who were sent a notice of the Data Breach.

120. Excluded from the Class are Defendant and its parents or subsidiaries, any entities in which it has a controlling interest, as well as its officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned as well as their judicial staff and immediate family members.

121.    Plaintiff reserves the right to modify or amend the definitions of the proposed Nationwide Class, as well as add subclasses before the Court determines whether certification is appropriate.

122.    The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

123.    <u>Numerosity</u>. The Class Members are so numerous that joinder of all members is impracticable. Though the exact number and identities of Class Members are unknown at this time, based on information and belief, the Class consists of 25,969 customers of Valley Vet whose data was compromised in the Data Breach. The identities of Class Members are ascertainable through Valley Vet's records, Class Members' records, publication notice, self-identification, and other means.

124.    <u>Commonality</u>. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

    a.   Whether Valley Vet engaged in the conduct alleged herein;

    b.   When Valley Vet learned of the Data Breach;

    c.   Whether Valley Vet's response to the Data Breach was adequate;

    d.   Whether Valley Vet unlawfully lost or disclosed Plaintiff's and Class Members' Private Information;

    e.   Whether Valley Vet failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

f.   Whether Valley Vet's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

g.   Whether Valley Vet's data security systems prior to and during the Data Breach were consistent with industry standards;

h.   Whether Valley Vet owed a duty to Class Members to safeguard their Private Information;

i.   Whether Valley Vet breached its duty to Class Members to safeguard their Private Information;

j.   Whether hackers obtained Class Members' Private Information via the Data Breach;

k.   Whether Valley Vet had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiff and the Class Members;

l.   Whether Valley Vet breached its duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class Members;

m.   Whether Valley Vet knew or should have known that its data security systems and monitoring processes were deficient;

n.   What damages Plaintiff and Class Members suffered as a result of Valley Vet's misconduct;

o.   Whether Valley Vet's conduct was negligent;

p.   Whether Valley Vet's conduct was *per se* negligent;

q.   Whether Valley Vet was unjustly enriched;

r.   Whether Plaintiff and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

s.   Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

125.   <u>Typicality</u>. Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class Member, was compromised in the Data Breach.

126.   <u>Adequacy of Representation</u>. Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff's counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

127.   <u>Predominance</u>. Valley Vet has engaged in a common course of conduct toward Plaintiff and Class Members in that all of Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from Valley Vet's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

128.   <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Valley

Vet. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

129.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2). Valley Vet has acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

130.    Finally, all members of the proposed Class are readily ascertainable. Valley Vet has access to the names and addresses and/or email addresses of Class Members affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Valley Vet.

## VI.    CLAIMS FOR RELIEF

### COUNT I
### NEGLIGENCE
**(On behalf of Plaintiff and the Nationwide Class)**

131.    Plaintiff restates and realleges all of the allegations stated above and hereafter as if fully set forth herein.

132.    Valley Vet knowingly collected, came into possession of, and maintained Plaintiff's and Class Members' Private Information, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such Information from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

133.    Valley Vet knew or should have known of the risks inherent in collecting the Private Information of Plaintiff and Class Members and the importance of adequate security. Valley Vet was on notice because, on information and belief, it knew or should have known that it would be an attractive target for cyberattacks.

134.    Valley Vet owed a duty of care to Plaintiff and Class Members whose Private Information was entrusted to it. Valley Vet's duties included, but were not limited to, the following:

    a.   To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in its possession;

    b.   To protect customers' Private Information using reasonable and adequate security procedures and systems compliant with industry standards;

    c.   To have procedures in place to prevent the loss or unauthorized dissemination of Private Information in its possession;

    d.   To protect customers' Private Information using reasonable and adequate security procedures and systems that are compliant with the PCI DSS and consistent with industry-standard practices;

    e.   To employ reasonable security measures and otherwise protect the Private Information of Plaintiff and Class Members pursuant to the FTCA;

    f.   To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

    g.   To promptly notify Plaintiff and Class Members of the Data Breach, and to precisely disclose the type(s) of information compromised.

135.    Valley Vet's duty to employ reasonable data security measures arose, in part, under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

136.    Valley Vet's duty also arose because Defendant was bound by industry standards to protect its customers' confidential Private Information.

137.    Plaintiff and Class Members were foreseeable victims of any inadequate security practices on the part of Defendant, and Valley Vet owed them a duty of care to not subject them to an unreasonable risk of harm.

138.    Valley Vet, through its actions and/or omissions, unlawfully breached its duty to Plaintiff and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiff's and Class Members' Private Information within Valley Vet's possession.

139.    Valley Vet, by its actions and/or omissions, breached its duty of care by failing to provide, or acting with reckless disregard for, fair, reasonable, or adequate computer systems and data security practices to safeguard the Private Information of Plaintiff and Class Members.

140.    Valley Vet, by its actions and/or omissions, breached its duty of care by failing to promptly identify the Data Breach and then failing to provide prompt notice of the Data Breach to the persons whose Private Information was compromised.

141.    Valley Vet breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

        a.   Secure its e-commerce and e-Payment website;

        b.   Secure access to its servers and computer network;

        c.   Audit and monitor its severs and computer network;

        d.   Comply with industry standard security practices;

        e.   Follow the PCI-DSS standards;

        f.   Encrypt PCD at the point-of-sale, during transit, and at rest;

g.  Employ adequate network segmentation;

h.  Implement adequate system and event monitoring;

i.  Utilize modern payment systems that provided more security against intrusion;

j.  Install updates and patches in a timely manner; and

k.  Implement the systems, policies, and procedures necessary to prevent this type of data breach.

142.  Valley Vet had a special relationship with Plaintiff and Class Members. Plaintiff's and Class Members' willingness to entrust Valley Vet with their Private Information was predicated on the understanding that Valley Vet would take adequate security precautions. Moreover, only Valley Vet had the ability to protect its systems (and the Private Information that it stored on them) from attack.

143.  Valley Vet's breach of duties owed to Plaintiff and Class Members caused Plaintiff's and Class Members' Private Information to be compromised and exfiltrated, as alleged herein.

144.  As a result of Valley Vet's ongoing failure to notify Plaintiff and Class Members regarding exactly what Private Information has been compromised, Plaintiff and Class Members have been unable to take the necessary precautions to prevent future fraud and mitigate damages.

145.  Valley Vet's breaches of duty also caused a substantial, imminent risk to Plaintiff and Class Members of identity theft, loss of control over their Private Information, and/or loss of time and money to monitor their accounts for fraud.

146.     As a result of Valley Vet's negligence in breach of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members are in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes.

147.     Valley Vet also had independent duties under state laws that required it to reasonably safeguard Plaintiff's and Class Members' Private Information and promptly notify them about the Data Breach.

148.     As a direct and proximate result of Valley Vet's negligent conduct, Plaintiff and Class Members have suffered damages as alleged herein and are at imminent risk of further harm.

149.     The injury and harm that Plaintiff and Class Members suffered was reasonably foreseeable.

150.     Plaintiff and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

151.     In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring Valley Vet to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

## COUNT II
## NEGLIGENCE *PER SE*
### (On behalf of Plaintiff and the Nationwide Class)

152.     Plaintiff restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

153.     Pursuant to Section 5 of the FTCA, Valley Vet had a duty to provide fair and adequate computer systems and data security to safeguard the Private Information of Plaintiff and Class Members.

154.    Valley Vet breached its duties by failing to employ industry-standard cybersecurity measures, including the PCI-DSS, in order to comply with the FTCA, including but not limited to proper segregation, access controls, password protection, encryption, intrusion detection, secure destruction of unnecessary data, and penetration testing.

155.    Plaintiff and Class Members are within the class of persons that the FTCA is intended to protect.

156.    The FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice of failing to use reasonable measures to protect PII (such as the Private Information compromised in the Data Breach). The FTC rulings and publications described above, together with the industry-standard cybersecurity measures set forth herein, form part of the basis of Valley Vet's duty in this regard.

157.    Valley Vet violated the FTCA by failing to use reasonable measures to protect the Private Information of Plaintiff and the Class and by not complying with applicable industry standards, as described herein.

158.    It was reasonably foreseeable, particularly given the growing number of data breaches of Private Information, that the failure to reasonably protect and secure Plaintiff's and Class Members' Private Information in compliance with applicable laws would result in an unauthorized third-party gaining access to Valley Vet's networks, databases, and computers that stored Plaintiff's and Class Members' unencrypted Private Information.

159.    Valley Vet's violations of the FTCA constitute negligence *per se*.

160.    Plaintiff's and Class Members' Private Information constitutes personal property that was stolen due to Valley Vet's negligence, resulting in harm, injury, and damages to Plaintiff and Class Members.

161.     As a direct and proximate result of Valley Vet's negligence *per se*, Plaintiff and the Class have suffered, and continue to suffer, injuries and damages arising from the unauthorized access of their Private Information, including but not limited to damages from the lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives.

162.     Valley Vet breached its duties to Plaintiff and the Class under the FTCA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

163.     As a direct and proximate result of Valley Vet's negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory and consequential damages in an amount to be proven at trial.

164.     In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring Valley Vet to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

<u>**COUNT III**</u>
**BREACH OF IMPLIED CONTRACT**
**(On behalf of Plaintiff and the Nationwide Class)**

165.     Plaintiff restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

166.     When Plaintiff and Class Members provided their Private Information to Defendant in order to utilize the e-Payment services on its website, they entered into implied contracts under which Defendant agreed to protect their Private Information and timely notify them in the event of a data breach.

167.     Defendant invited its customers and website users, including Plaintiff and the Class, to make payments to particular entities on its website using multiple different payment options,

including but not limited to, debit and credit cards, in order to increase sales by making payments more convenient.

168.    An implicit part of the offer was that Defendant would safeguard their Private Information using reasonable and industry-standard means and would timely notify Plaintiff and Class Members in the event of a data breach.

169.    Defendant also affirmatively represented in its Privacy Policy that it would protect the Private Information of Plaintiff and Class Members in several ways, as described above.

170.    Based on the implicit understanding and also on Defendant's representations, Plaintiff and Class Members accepted the offers and provided Defendant with their Private Information by using their payment cards in connection with e-Payments on the Defendant's website both before and during the period of the Data Breach.

171.    Defendant manifested its intent to enter into an implied contract that included a contractual obligation to reasonably protect Plaintiff's and Class Members' Private Information through, among other things, its Privacy Notice.

172.    Defendant further demonstrated an intent to safeguard the Private Information of Plaintiff and Class Members through its conduct. No reasonable person would provide sensitive, non-public information to any payment platform without the implicit understanding that the platform would maintain that information as confidential.

173.    In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

174.     Plaintiff and Class Members would not have provided their Private Information to Defendant had they known that Defendant would not safeguard their Private Information as promised.

175.     Plaintiff and Class Members fully performed their obligations under the implied contracts with Defendant.

176.     The losses and damages Plaintiff and Class Members sustained (as described above) were the direct and proximate result of Defendant's breaches of its implied contracts with them.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiff and the Nationwide Class)**

177.     Plaintiff restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

178.     This Count is pleaded in the alternative to Counts III and IV above.

179.     Plaintiff and Class Members conferred a benefit on Valley Vet by turning over their Private Information to Defendant and by paying for products and services that should have included cybersecurity protection to protect their Private Information. Plaintiff and Class Members did not receive such protection.

180.     Upon information and belief, Valley Vet funds its data security measures entirely from its general revenue, including from payments made to it by Plaintiff and Class Members.

181.     As such, a portion of the payments made by Plaintiff and Class Members is to be used to provide a reasonable and adequate level of data security that is in compliance with applicable state and federal regulations and industry standards, and the amount of the portion of each payment made that is allocated to data security is known to Valley Vet.

182. Valley Vet has retained the benefits of its unlawful conduct, including the amounts of payment received from Plaintiff and Class Members that should have been used for adequate cybersecurity practices that it failed to provide.

183. Valley Vet knew that Plaintiff and Class Members conferred a benefit upon it, which Valley Vet accepted. Valley Vet profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes, while failing to use the payments it received for adequate data security measures that would have secured Plaintiff's and Class Members' Private Information and prevented the Data Breach.

184. If Plaintiff and Class Members had known that Valley Vet had not adequately secured their Private Information, they would not have agreed to provide such Private Information to Defendant.

185. Due to Valley Vet's conduct alleged herein, it would be unjust and inequitable under the circumstances for Valley Vet to be permitted to retain the benefit of its wrongful conduct.

186. As a direct and proximate result of Valley Vet's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) the loss of the opportunity to control how their Private Information is used; (ii) the compromise, publication, and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in Valley Vet's possession and is subject to further unauthorized disclosures so long as Valley Vet fails to

undertake appropriate and adequate measures to protect Private Information in its continued possession; and (vi) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

187.     Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Valley Vet and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Valley Vet from its wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

188.     Plaintiff and Class Members may not have an adequate remedy at law against Valley Vet, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

## COUNT V
## DECLARATORY JUDGMENT
### (On behalf of Plaintiff and the Nationwide Class)

189.     Plaintiff restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

190.     Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal statutes described in this Complaint.

191.     Valley Vet owes a duty of care to Plaintiff and Class Members, which required it to adequately secure Plaintiff's and Class Members' Private Information.

192.     Valley Vet still possesses Private Information regarding Plaintiff and Class Members.

193.    Plaintiff alleges that Valley Vet's data security measures remain inadequate. Furthermore, Plaintiff continues to suffer injury as a result of the compromise of her Private Information and the risk remains that further compromises of her Private Information will occur in the future.

194.    Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.  Valley Vet owes a legal duty to secure its customers' Private Information and to timely notify customers of a data breach under the common law and Section 5 of the FTCA;

b.  Valley Vet's existing security measures do not comply with its explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices that are appropriate to protect customers' Private Information; and

c.  Valley Vet continues to breach this legal duty by failing to employ reasonable measures to secure customers' Private Information.

195.    This Court should also issue corresponding prospective injunctive relief requiring Valley Vet to employ adequate security protocols consistent with legal and industry standards to protect customers' Private Information, including the following:

a.  Order Valley Vet to provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

b.  Order that, to comply with Defendant's explicit or implicit contractual obligations and duties of care, Valley Vet must implement and maintain reasonable security measures, including, but not limited to:

    i.      engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Valley Vet's systems on a periodic basis, and ordering Valley Vet to promptly correct any problems or issues detected by such third-party security auditors;

    ii.     engaging third-party security auditors and internal personnel to run automated security monitoring;

    iii.    auditing, testing, and training its security personnel regarding any new or modified procedures;

    iv.    segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Valley Vet's systems;

    v.     conducting regular database scanning and security checks;

    vi.    routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

    vii.   meaningfully educating its users about the threats they face with regard to the security of their Private Information, as well as the steps Valley Vet's customers should take to protect themselves.

196.    If an injunction is not issued, Plaintiff will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach at Valley Vet. The risk of another such breach is real, immediate, and substantial. If another breach at Valley Vet occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantifiable.

197.    The hardship to Plaintiff if an injunction does not issue exceeds the hardship to Valley Vet if an injunction is issued. Plaintiff will likely be subjected to substantial, continued identity theft and other related damages if an injunction is not issued. On the other hand, the cost of Valley Vet's compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and Valley Vet has a pre-existing legal obligation to employ such measures.

198.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach at Valley Vet, thus preventing future injury to Plaintiff and other customers whose Private Information would be further compromised.

## VII.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff, on behalf of herself and the Class described above, seeks the following relief:

   a.   An order certifying this action as a Class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiff is a proper representative of the Nationwide Class requested herein;

   b.   Judgment in favor of Plaintiff and Class Members awarding them appropriate monetary relief, including actual damages, statutory damages, equitable relief, restitution, disgorgement, and statutory costs;

   c.   An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

d.   An order instructing Valley Vet to purchase or provide funds for lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members;

e.   An order requiring Valley Vet to pay the costs involved in notifying Class Members about the judgment and administering the claims process;

f.   A judgment in favor of Plaintiff and Class Members awarding them prejudgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

g.   An award of such other and further relief as this Court may deem just and proper.

## VIII.   **<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff demands a trial by jury on all triable issues.

DATED:  May 1, 2024.                    Respectfully submitted,


                                        */s/ Michael D. Pospisil*
                                        Michael D. Pospisil KS#18540
                                        Matthew T. Swift KS#25375
                                        Pospisil Swift LLC
                                        1600 Genessee St., Ste. 340
                                        Kansas City, Missouri 64102
                                        Tel: (816) 895-6440
                                        Fax: (816) 895-9161
                                        mts@pslawkc.com
                                        mdp@pslawkc.com

                                        and

                                        Mason A. Barney
                                        Tyler J. Bean
                                        **SIRI & GLIMSTAD LLP**
                                        745 Fifth Avenue, Suite 500
                                        New York, New York 10151
                                        Tel: (212) 532-1091
                                        E: mbarney@sirillp.com
                                        E: tbean@sirillp.com


                                        Counsel for Plaintiff and the Class